FRANZ BOUQUET

*v.*

SIMON HEYMAN and HENRIETTA HEYMAN.

1. As to existing creditors a voluntary deed will be presumed to be fraudulent, whether it was executed with an actual intent to defraud or not.

2. But subsequent creditors can only impeach a voluntary deed by proving actual fraud; that is, they must show "the existence of an actual intent in the minds of the parties, at the time of the execution of the conveyance, to hinder, delay or defraud creditors by means of the deed."

---

On final hearing on bill and answer and proofs taken before a master.

*Mr. John Garrick,* for the complainant.

*Mr. William Brinkerhoff,* for the defendant.

VAN FLEET, V. C.

The complainant is a judgment creditor of the defendant Simon Heyman. He seeks a decree charging his judgment on lands standing in the name of the defendant Henrietta Heyman. The defendants are husband and wife. The lands in question were conveyed to the husband in May, 1881. They were then unimproved. The husband, subsequently, erected a brick dwelling on them, and on March 12th, 1883, conveyed them, through a third person, to his wife. Though the defendants have made an attempt to prove that the deed by which the title was put in the name of the wife, were founded on a consideration sufficient to render them valid against creditors, it will, for present purposes, be assumed that they were voluntary. The weight of the evidence leans strongly in that direction. The complainant's judgment is founded on a promissory note made by the defendant Simon to Bernhard Mittelstaedt, for $500, bearing date February 4th, 1884, and payable fourteen months after date. The note, it will be observed, bears date nearly eleven months subsequent to the date of the conveyances which the complainant assails. From this fact it follows necessarily, according to established principle, that if the note was given for a debt which had no existence when the deeds were made, but arose subsequently, the complainant will not be entitled to the relief he asks unless he has established a case of actual fraud; that is, proved that the deeds were made with intent to defraud such persons as should, subsequent to their date, become creditors of Simon Heyman.

The law on this subject is authoritatively settled and may be stated as follows: As to existing creditors, a voluntary deed will be presumed to be fraudulent, whether it was executed with an actual intent to defraud or not. In such case " fraud is the legal conclusion arising from the contemporaneous occurrence of the two facts, namely, a voluntary deed and an existing debt due by the grantor." But subsequent creditors can only impeach a voluntary deed by proving actual fraud, and this means that they must show " the existence of an actual intent in the minds of the parties, at the time of the execution of the conveyance, to hinder, delay or defraud creditors by means of the deed." *Hagerman* v.

*Buchanan*, *18 Stew. Eq. 292.* According to the face of the papers the complainant here is a subsequent creditor, and hence cannot, acccording to the rule just stated, prevail unless he has established a case of actual fraud. The case is destitute of all evidence tending to prove actual fraud. There is not enough to support even a moderately strong suspicion that the parties, in making the deeds, were instigated by a fraudulent motive. The deeds show on their face that they were voluntary ; each purports to have been founded on a nominal consideration of $1 ; both were executed on the same day, thus showing that they were executed to change the title from the husband to his wife, and they were also both placed on record on the day of their execution. A person intending to commit a fraud, by obtaining credit on the faith of property that he does not own, does not usually make public the fact that he is not its owner. To do so would, as is obvious, serve rather to defeat than aid him in the execution of his scheme. Where, therefore, a husband conveys property to his wife, and immediately after he has done so, makes the fact public by placing the deeds on record, it should, as it seems to me, be held that his conduct furnishes evidence of rectitude of intention rather than of a purpose to commit a fraud. Actual fraud cannot be presumed, but must be proved.

But the complainant claims that the debt, on which his judgment is founded, originated long prior to the time when the deeds were made, and as early as 1882, and that it has ever since continued to be a subsisting liability of Simon Heyman. His claim, stated in another form, is, that he stands in the right of a debt which existed prior to the time when the title was transferred from the husband to his wife, and consequently that he has the same right now to impeach the deeds that the person had who held his debt when the deeds were made. It is not disputed that, if the complainant's debt existed when the deeds were made, and the deeds are not supported by a consideration sufficient to render them valid against creditors, the complainant may successfully impeach their validity. The dispute in the case relates exclusively to the time when the complainant's debt arose. He asserts that it arose prior to the date of the deeds, while the defendants

say that it did not arise until October, 1883, more than six months after the deeds were executed and recorded.

The facts pertinent to this issue may be summarized as follows : Heyman and Bernhard Mittelstaedt formed a co-partnership ; while so associated they became indebted to the Pacific Bank of New York in the sum of $11,800 ; this debt was secured by the pledge of collaterals belonging to Emma Mittelstaedt, the wife of Bernhard ; she paid this debt to the bank in October, 1883, and thus became the creditor of the firm in the amount of the debt ; on the 27th day of October, 1883, Heyman & Mittelstaedt made an agreement of dissolution, under seal, by which all the property and the good will of the firm were sold to Heyman, and he became bound to pay all its debts and liabilities, and also to make and deliver to Mittelstaedt, in the language of the agreement, "twenty-four notes, each of $500, payable monthly, with five per cent. interest, beginning with the fourth day of February next [1884] as the date of the first note." The position in which the co-partners placed themselves towards each other by this agreement was this : Heyman became the owner of all the assets of the firm and made himself liable to pay all its debts and liabilities, including the $11,800, to Mrs. Mittelstaedt, and, in addition, became liable to Mittelstaedt for $12,000. Though the agreement does not, in express words, say that the $12,000 is to be paid to Mittelstaedt for his interest in the firm assets, yet that is undoubtedly what the parties meant. No other rational construction can be given to the agreement. Heyman was to pay all the debts and liabilities of the firm and $12,000 in addition to Mittelstaedt. Unless, therefore, the twenty-four notes were given for the amount, which had been agreed upon as the value of Mittelstaedt's interest in the firm assets, they were mere naked promises, unsupported by any consideration whatever. Heyman, in fulfillment of the agreement, made and delivered twenty-four notes to Mittelstaedt. Mittelstaedt endorsed one of them to the complainant, and the debt he thus acquired constituted the foundation of the judgment on which his bill in this case rests.

If the facts just stated embrace all the evidence material to the vital issue of the case, it is made clear, beyond question, that

the complainant's debt did not come into existence until the 27th
day of October, 1883. And if that is so, it is equally clear that
he has no case. He contends, however, that the twenty-four
notes were not given for Mittelstaedt's interest in the firm assets,
but for the debt due by the firm to Mrs. Mittelstaedt, and which
Heyman, by the dissolution agreement, agreed to pay. This
contention is supported by the evidence of Mittelstaedt. Hey-
man, on the contrary, swears that the notes were given for Mit-
telstaedt's interest in the firm assets. The evidence of neither of
these witnesses can be regarded as entirely trustworthy. Each,
while giving evidence, made statements which plainly·show that
his purpose was to conceal or distort the actual facts. It is un-
necessary to review or dissect their evidence, for the written evi-
dence in the case makes it clear and plain what the truth is on
the point in dispute. The provisions of the agreement of disso-
lution have already been given. That agreement was reduced to
writing and signed in Havana, Cuba, while the co-partners were
temporarily there. It provided, it will be remembered, that
Heyman should give Mittelstaedt twenty-four notes, of $500
each, and pay all the debts of the firm. It is undisputed that
the twenty-four notes were made and delivered by Heyman to
Mittelstaedt in Havana, either contemporaneously with the sign-
ing of the dissolution agreement or within a few days thereafter.
They were all made in October, 1883, but postdated February
4th, 1884, and so drawn as to be payable to Mittelstaedt and not
to his wife. At this point in the transactions of the co-partners,
Heyman's position, in point of legal liability, was this: He was
liable to Mittelstaedt for $12,000, and also for all the debts of
the firm, including the $11,800 due to Mrs. Mittelstaedt. While
the contract relations of the co-partners remained in this condi-
tion, there could be no doubt whatever respecting their relative
rights and duties. Their written contracts, as well as their acts
under them, demonstrated conclusively what they understood
constituted the consideration of the twenty-four notes. Without
impugning the accuracy or validily of their contracts, it was not
possible for either, truthfully, to say that the notes were not given

for Mittelstaedt's interest in the firm assets.   That constituted
their consideration, or they were without consideration.   Disputes
subsequently arose, and to settle them another contract in writing
was made by the co-partners on the 11th day of January, 1884.
It is unnecessary to state the terms of this last contract further
than to say, that it recognized Mittelstaedt as the owner of the
twenty-four notes, and provided that Heyman should have the
right to pay the fourteen first maturing, by returning to Mittel-
staedt a part of the property which, on the dissolution, had been
transferred to Heyman.   And also, that Mittelstaedt by it agreed
to procure a release from his wife to Heyman "for moneys
alleged to have been loaned by her to said Heyman & Mittel-
staedt to pay to the Pacific Bank, amounting to $11,800."   On
the same day that this last contract bears date Mrs. Mettelstaedt
executed such a release to Heyman, releasing him generally from
all claims and demands, "and especially"—to quote the words
of the release—"from all claim for moneys loaned by me to Hey-
man & Mittelstaedt to pay claim of Pacific Bank and for other
purposes, amounting to $11,800."   These papers establish two
important facts—*first*, that the debt claimed to be due to Mrs.
Mittelstaedt, for money paid by her for the firm to the Pacific
Bank, was treated by the co-partners, on the 11th day of Janu-
ary, 1884, as an outstanding liability of the firm, without pre-
tence on the part of her husband that it had been transformed,
by means of the twenty-four notes, made in October, 1883, into
the separate individual debt of Heyman ; *second*, that Mrs. Mit-
telstaedt, on the 11th day of January, 1884, voluntarily extin-
guished all claim and right of action which she then had against
Heyman, arising out of the payment which she claimed to have
theretofore made to the Pacific Bank for the firm.   Her release,
as its language plainly shows, was executed for the purpose of
extinguishing absolutely and forever her debt against the firm
so far as Heyman was concerned.   While this release remains
in force, the debt which it discharged must, in point of law,
be regarded as effectually extinguished as though it had never
existed.

The proofs, in my judgment, show conclusively that the debt, on which the complainant's judgment is founded, arose more than six months subsequent to the time when the deeds he seeks to impeach were made, and, as he has failed to prove a case of actual fraud, it follows that his bill must be dismissed, with costs.